IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| SANDRA DOBBS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | 7:14-cv-01363-LSC |
| LAKELAND COMMUNITY | ) | |
| HOSPITAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OF OPINION

Plaintiff Sandra Dobbs ("Dobbs"), a former employee of Defendant Lakeland Community Hospital (the "Hospital"), brought this action alleging violations of the Age Discrimination in Employment Act ("ADEA") and the Family and Medical Leave Act ("FMLA"). The Hospital has moved for summary judgment, and for the reasons discussed below, the Hospital's motion is due to be granted.

## I.  Background

Plaintiff Sandra Dobbs worked at Defendant Lakeland Community Hospital for over thirteen years, beginning in 2000. In 2009, she was promoted to Director of Infection Control. In 2010, she added the titles of Director of Quality and Risk Management and Patient Safety Officer. On two different performance reviews in

2010, Dobbs received generally positive remarks. Dobbs reported to the Hospital's Chief Nursing Officer ("CNO"). Helen Vos was the interim CNO and was later replaced by Cathy Mitchell. Cindy Nichols was the Chief Executive Officer of the Hospital when Dobbs was terminated.

In August 2012, Dobbs suffered a heart attack. As a result of the heart attack, Dobbs requested and was approved for FMLA leave. Dobbs returned from her FMLA leave after approximately two weeks. In November of that year, Dobbs requested and was approved for another FMLA leave due to back surgery. While she was on leave, Dobbs says that she felt obligated to work. She stated in her deposition:

> I actively volunteered through correspondence with [Nichols] . . . to come on in and be there so I could produce my material for the SRA. And . . . I wasn't given that opportunity, and then I sent a itemized list to them telling them what binders [certain reports] were in . . . .

(Dobbs Dep. 172:23 to 173:1–8). Moreover, Dobbs emailed Nichols hoping she could return early and asking if she could schedule physical therapy sessions three times a week when she returned, to which Nichols responded: "That would be fine Sandy as long as you are in compliance with what is recommended by your physician and HR okays the return." (Nichols Dep. Ex. 8). Much of the work Dobbs felt obligated to do regarded a Survey Readiness Assessment ("SRA")—a survey of the Hospital conducted by its parent company evaluating preparation for

accreditation by the Joint Commission. The SRA reviewed departments under Dobbs's supervision, and it noted deficiencies in those areas. Dobbs does not dispute that the SRA noted deficiencies in areas under her control.

In January 2013, Nichols met with Dobbs and discussed reducing Dobbs's job duties. During the meeting, Nichols stated that she heard Dobbs might be considering retirement and asked how old she was. Nichols and Dobbs agreed to reduce Dobbs's job duties and relinquish the titles of Director of Quality and Risk Management and Patient Safety Officer. Dobbs salary was reduced by five percent to reflect the reduction in responsibilities. Dobbs does not dispute that she agreed to the reduction in title and pay. She stated in her deposition that she "felt overloaded" and that she "didn't feel like [she] could do as good a job in any certain one of those five things because each one of those was a very in-depth job and very time consuming." (Dobbs Dep. 142: 7–14). When asked if she was "okay with the redistribution of duties that was discussed at the meeting," she said "yes." (Dobbs Dep. 154: 19–22). Further, she responded "No" when asked, "They didn't force you to resign as the Quality and Risk Management Director?" (Dobbs Dep. 154: 23 to 155: 1–2).

In February of 2013, Helen Vos, the interim CNO, placed Dobbs on a performance improvement plan based on deficiencies she perceived in Dobbs's

performance and the deficiencies in the SRA. Although Dobbs admits that the SRA noted deficiencies attributable to her, she testified that she had the required documentation, but that documentation was not provided for the survey while she was on leave. Further, Dobbs argues that the performance improvement plan was meant to last ninety days, but the Hospital says that it was ongoing. The performance improvement plan included a specific list of "Actions" that Dobbs needed to take. Neither party has provided clear evidence that shows which items were accomplished and which were not.[1] Vos met with Dobbs on a regular basis to discuss her progress. Vos stated that Dobbs did not meet the goals in the plan, although Dobbs thought that she did. Mitchell, who became CNO after Vos, also met with Dobbs periodically to review her progress. On March 22, 2013, Dobbs was issued a written warning. The Hospital contends that the warning was for failing to meet the goals in her performance improvement plan, but Dobbs contends that the warning was merely a formalization of the performance improvement plan that should have been delivered in February. At an April 25, 2013 meeting, Mitchell noted that certain items on Dobbs's performance improvement plan were complete and others were ongoing. In a memorandum created after a May 14, 2013 meeting, Mitchell states she "spoke at length with

---

[1] The parties provided copies of the performance improvement plan with notes made under the "weekly progress" column. However, the exhibits do not show with clarity who wrote the notes and whether the items were accomplished.

Sandy regarding the issues with this submission and the corrections that would need to be made. [Mitchell] also spoke with Sandy regarding the importance of ensuring the information she submits is accurate to the best of her ability. . . . [Mitchell] told Sandy she was very concerned about the [Infection Control] program and that [they] would continue meeting and continue her plan until all aspects of the plan were at or above the standards for an appropriate IC program." (Pl.'s Ex. 28)." Dobbs testified at the meeting that Mitchell did not tell her whether her goals were met. (Pl.'s Ex. 28). Following that meeting, Mitchell discussed additional disciplinary measures with Katrina Wray, the Director of Human Resources, who stated that suspension would be the next step in the disciplinary process. In an email exchange dated May 15, Mitchell and Nichols discussed Mitchell's concern about Dobbs placing the emergency room on diversion[2] and disciplinary measures they might take.

On May 16, Mitchell noticed a nurse taking a patient into the Operating Room wearing jeans and shoes. The Operating Room was being used for eye surgeries performed by Dr. Donald McCurdy that day. Dr. McCurdy had performed those procedures at both Lakeland Hospital and Northwest Medical Center, Lakeland's sister hospital, for many years. Mitchell reported her

---

[2] When the emergency room is on diversion, it no longer accepts ambulances and sends those patients elsewhere.

observation to Nichols, asserting that allowing patients to wear street clothes into the Operating Room created a risk of contamination. Nichols discussed this concern with Dr. Donald McCurdy who related that Lakeland Hospital was the only place he performed the surgery that allowed patients to wear street clothes. Dr. McCurdy did, however, testify that other facilities—including Northwest Medical Center—followed similar procedures. Specifically, he stated that other hospitals allow patients to wear street clothes but covered those clothes with a gown. On the same day, May 16, Nichols and Mitchell discussed patients wearing street clothes with Dobbs. Following this discussion and consultation with other administrators, Nichols terminated Dobbs. In a subsequent conversation, Shirley Craig, who was Director of Infection Control before Dobbs, told Nichols that previous hospital administrators had approved the practice of allowing patients to wear street clothes into the operating room.

## II.   Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a "genuine dispute" as to a material fact "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The trial judge should not weigh the evidence but must simply determine where there are any genuine issues that should be resolved at trial. *Id.* at 249.

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "considering all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party." *McGee v. Sentinel Offender Services, LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (citing *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *Id.* Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986).

## III.   Discussion

Dobbs makes three claims against the Hospital. First, Dobbs claims that the Hospital terminated her employment based on her age in violation of the ADEA.

Second, she claims that the Hospital retaliated against her for taking approved leave under the FMLA. Third, Dobbs claims that the Hospital interfered with her FMLA leave. For the reasons stated below, the Hospital's motion for Summary Judgment is due to be GRANTED.

### A. ADEA Claim

The ADEA prohibits employers from "discharg[ing] or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1). The standard in a given case differs depending on whether a plaintiff produces direct evidence of discrimination or circumstantial evidence sufficient to allow an inference of discrimination. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641–643 (11th Cir. 1998). Dobbs has not alleged or produced any direct evidence of discrimination based on age.[3] Instead, she relies on circumstantial evidence.

In cases where a plaintiff relies on circumstantial evidence, the Eleventh Circuit applies the burden-shifting scheme first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1267

---

[3] Dobbs did testify in her deposition that Nichols asked her about retirement. However, she has not argued that Nichol's questioning directly evidences discrimination. Furthermore, an employer saying that she heard the employee had mentioned retirement is not a statement "whose intent could be nothing other than to discriminate . . . ." *Carter*, 870 F.2d at 582.

n.6 (11th Cir. 2001) ("Although the *McDonnell Douglas* framework originally applied to Title VII cases, it is now widely accepted that the framework applies to claims of discrimination under the ADEA as well."). Under *McDonnell Douglas*, a plaintiff carries the initial burden of producing circumstantial evidence sufficient to prove a prima facie case of discrimination. *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998). If the plaintiff meets this burden, then the burden shifts to the defendant to produce evidence of a "legitimate, nondiscriminatory reason for its actions." *Id.* If the defendant produces evidence of a legitimate reason, then "the plaintiff must establish that the employer's articulated legitimate, nondiscriminatory reason was a pretext to mask unlawful discrimination." *Id.* The plaintiff's burden to establish pretext applies to all of the defendant's proffered reasons. *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). Thus, when a defendant proffers more than one reason, a plaintiff fails to meet this prong if she only establishes pretext as to one of those reasons. *Id.*

### 1. Prima Facie Case

A prima facie case alleging wrongful discharge under the ADEA requires a showing:

> (1) that [plaintiff] was a member of the protected group of persons between the ages of forty and seventy; (2) that [she] was subject to adverse employment action; (3) that a substantially younger person filled the position that [she] sought or from which [she] was

discharged; and (4) that [she] was qualified to do the job for which [she] was rejected.

*Turlington*, 135 F.3d at 1432.[4] The Hospital does not contest the first three elements. Dobbs was sixty-one years old at the time of termination. She was terminated, and she was replaced by younger persons.

The Hospital does, however, argue that Dobbs was not qualified. A qualified employee must "satisfy[y] an employer's objective qualifications." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769 (11th Cir. 2005) (Title VII context). An employee's "skill and background" often "determine if they were qualified for a particular position." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 (11th Cir. 1993). Subjective evidence, in light of evidence showing objective skill or experience, is typically best saved for the pretext stage. *See Young v. General Foods Corp.*, 840 F.2d 825, 829 n.3 (11th Cir. 1988) (indicating subjective assessments of job performance are best addressed at pretext stage).

The undisputed evidence provided by the parties indicates that Dobbs had the requisite education and experience to hold the position of Director of Infection Control at the time of her termination. At the time Dobbs was promoted to

---

[4] Moreover, the "plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 168 (2009). However, this causation requirement is consistent with the *McDonnell Douglas* framework. *See Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013) ("[Requiring but-for causation] is not only consistent with our pre-*Gross* case law, but also is entirely consistent with *Gross*, which expressly left open the question of whether this application is appropriate.").

Director of Infection Control, the job requirements included: current Alabama Registered Nurse license, minimum of one year experience in a hospital supervisory position or three years in infection control, membership in the Association of Practitioners of Infection Control (APIC), and a working knowledge of microbiology, epidemiology, infectious diseases, aseptic techniques and current practices. (Mitchell Dep. Ex. 5). Within a month of Dobbs termination, Lakeland amended the job description for Director of Infection Control, and the Registered Nurse requirement was removed. The evidence demonstrates that Dobbs worked at Lakeland as a Registered Nurse before becoming Director of Infection Control. Further, she stated in a performance evaluation that she intended to maintain her license. Thus, at her hiring, Dobbs met the qualification that she be a licensed RN. The evidence does not indicate with clarity whether Dobbs maintained her RN license when she was terminated, but because the Hospital removed that requirement for Dobbs's successor, she need not prove a qualification the Hospital waived. *See Anthony v. BTR Automotive Sealing Systems, Inc.*, 339 F.3d 506, 515 (6th Cir. 2003). Additionally, at the time Dobbs was terminated, she had been the Director of Infection Control, Director of Quality and Risk Management, or Patient Safety officer for over three years, which sufficiently meets the requirement for one year of supervisory experience. Further, Dobbs was a member of APIC when she

was terminated. (Dobbs Dep. 29: 10–12; Nichols Dep. 254: 15–17). When she first began as Director of Infection Control, Dobbs attended training on infection control, and she testified in her deposition that she made an effort to keep up with best practices regarding infection control. (Dobbs Dep. 30: 10–23). Although the Hospital has presented evidence of negative assessments of Dobbs work,[5] it has provided no evidence disputing Dobbs's objective qualifications. Accordingly, Dobbs possessed the minimum qualifications necessary to perform as Director of Infection Control. As such, she has demonstrated a prima facie case alleging wrongful discharge under the ADEA.

### 2.  Proffered Legitimate Reasons and Pretext

The burden thus shifts to the Hospital to offer a legitimate, non-discriminatory reason for Dobbs's termination. This burden is "exceedingly light" because it is a burden of production, not persuasion. *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995). Here, the Hospital has met that burden by proffering two reasons for the termination. First, the Hospital says that Dobbs failed to correct the unsanitary practice of allowing patients to wear street

[5] The Hospital argues that Dobbs was not qualified because: (1) she was placed on a performance improvement plan based on deficiencies from the SRA, (2) Cindy Nichols's conversation with Dobbs expressing concerns about her performance, (3) a written warning issued to Dobbs, and (4) Cathy Mitchell's conversation with Dobbs expressing concerns about her performance. However, such subjective "concerns about . . . performance are more appropriately raised as part of the second and third steps of the *McDonnell Douglas* scheme." *Clark*, 990 F.2d at 1227.

clothes into the operating room on eye surgery days. Second, the Hospital says that Dobbs failed to meet the goals outlined in her performance improvement plan.

Since the defendant met the burden of producing a legitimate, non-discriminatory reason for termination, the burden shifts back to the plaintiff to show that the defendant's proffered reason is mere pretext for illegal discrimination. *See Turlington*, 135 F.3d at 1432. Pretext can be demonstrated "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Kragor v. Takeda Pharmaceuticals America, Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). "When a plaintiff chooses to attack the veracity of the employer's proffered reason, '[the] inquiry is limited to whether the employer gave an honest explanation of its behavior.'" *Kragor*, 702 F.3d at 1310–1311.

Dobbs offers five theories of the Hospital's alleged pretext. First, Dobbs argues that the Hospital's purported reasons for termination are inconsistent with the termination form. However, the termination form notes the Hospital's concern about allowing patients wearing street clothes into the operating room. Further, the statement, "Discussed Sandy's action plan to date," is consistent with the

Hospital's claim that Dobbs failed to adequately complete her performance improvement plan. No additional specificity in the termination form is required. *See Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1377 (11th Cir. 1996) (holding that providing additional detail is not inconsistent with a general reason given in a written termination).

Second, Dobbs argues that a genuine issue of material fact is raised because the parties disagree when the performance improvement plan ended. Dobbs says that it ended after ninety days, while the Hospital says that it was ongoing. However, a dispute about the timing of the plan does not demonstrate a dispute about the veracity of the Hospital's assessment of Dobbs's accomplishment of the goals of the plan. Even if the performance improvement plan ended after ninety days, as Dobbs contends, the Hospital could still truthfully assert that she did not meet her goals. The performance improvement plan included a specific list of "Actions" that Dobbs needed to take. Neither party has provided clear evidence that shows which items were accomplished and which were not. The parties provided evidence showing that Dobbs and Mitchell met on April 25, 2013 where Mitchell noted that certain items were completed and others were ongoing or needed to be completed prospectively. Further, Mitchell and Dobbs met on May 14, 2015. In that meeting, Dobbs brought most of the items

Mitchell requested. Mitchell then pointed out issues with some of the items—which Dobbs testified were clerical—and stated that she "was very concerned about the IC program" and that she considered the infection control program below "the standards for an appropriate IC program." In response to questioning in her deposition about whether Mitchell told her at the May 14, 2013 meeting that she had met her goals, Dobbs said, "She didn't say." However, even if Mitchell did not express her assessment of Dobbs performance in the meeting, she included it in a memorandum. Dobbs has not demonstrated why that assessment in the memorandum is false or pretextual. She has not presented any evidence showing that the infection control program was up to standard or that Mitchell was not being truthful in her assessment. Absent such evidence, Dobbs has failed to meet her burden of showing how the Hospital's proffered reason for terminating her was pretextual.

Dobbs third theory of pretext is that the Hospital failed to follow its own progressive discipline policies when it terminated her instead of suspending her, which the Hospital does not dispute. An employer's "[departure] from normal procedures may be suggestive of discrimination" in some instances. *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985) (holding that failing to seek flexibility for promotion of a black employee when flexibility was sought for white employees was

suggestive of discrimination in racial discrimination case). However, "[s]tanding alone, deviation from a company policy does not demonstrate discriminatory animus." *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355–1356 (11th Cir. 1999). A plaintiff must further demonstrate that the deviation from policy was somehow linked to her protected status. *See id.*; *E.E.O.C. v. Texas Instruments, Inc.*, 100 F.3d 1173, 1182 (5th Cir. 1996) (finding that deviation from policy was not evidence of pretext absent a nexus to the plaintiff's age). Dobbs has not provided any evidence demonstrating different treatment of other younger employees or that she was otherwise treated differently because of her age. Accordingly, Dobbs's argument that a failure to follow normal discipline policy fails.

Dobbs's fourth theory argues that both Nichols and Mitchell were in supervisory positions at Lakeland's sister hospital, Northwest Medical Center, when, as a matter of practice, patients presented to the operating room in street clothes for cataract surgery performed by Dr. McCurdy. Nichols was Chief Nursing Officer at Northwest between 2002 and 2012, and Mitchell was the Director of Infection Control between 2006 and 2010 and the Operating Room Director between 2012 and 2013. (Nichols Dep. 30: 15–19; Mitchell Dep. 33: 1–22). Both stated in their depositions that they were not aware of any patients brought to the operating room in street clothes. However, Dr. McCurdy, who began

performing that procedure in 1995 and still performed it as of the date of his deposition, stated that for as long as he could remember, patients presented to the operating room in street clothes, although they were covered in gowns. (McCurdy Dep. 15: 1–19). Arguably, Mitchell and Nichols, having worked in supervisory roles in those facilities, could have known what attire patients wore in the operating room. However, those patients' street clothes were always covered with hospital gowns and thus somewhat different than at Lakeland Community Hospital, where some patients were covered in gowns and some were not. Dobbs contends that since Mitchell and Nichols knew of a similar practice at the other hospital, then a jury could find that Mitchell and Nichols terminated Dobbs for the improper reason, not for allowing conduct that they also allowed while at another hospital. Dobbs argument is that this inconsistent application of policy demonstrates that Nichols and Mitchell might not have been truthful when they say they terminated Dobbs based on patients wearing street clothes into the operating room.

Finally, Dobbs argues that the Hospital's "true motive is seen in an email where they discussed the fact that Dobbs had placed the emergency room on diversion." (Pl.'s Br. At 25). This email exchange between Nichols and Mitchell discussed Dobbs's decision to place the emergency room on diversion, their disapproval of that decision, and the possibility of taking away Dobbs's authority to

order diversion. This evidence is not sufficient to prove pretext. The email exchange does not bring into question the veracity of Nichols's and Mitchell's reliance on their perception that Dobbs failed to meet the goals in the performance improvement plan. Viewed in a light most favorable to Dobbs, the email exchange only shows that Nichols and Mitchell disapproved of Dobbs's decision concerning diversion and that they considered remedial measures. Moreover, Mitchell documented her concern about Dobbs's performance improvement plan the day before the email exchange. Thus, the memorandum would evidence how Mitchell did not fabricate her disapproval of Dobbs's performance improvement in response to the emergency room diversion. Further, the email exchange does not "directly . . . persuad[e] the court that a discriminatory reason more likely motivated the employer" because the email exchange does not demonstrate discrimination. *Kragor*, 702 F.3d at 1308. If anything, Dobbs placing the emergency room on diversion would have been an additional non-pretextual and non-discriminatory reason for terminating Dobbs.

Even if this court were to find that Dobbs sufficiently produced evidence to find that terminating her based on allowing patients into the operating room in street clothes was pretextual, she failed to impeach the Hospital's other reason for termination. Dobbs did not show how the Hospital was not truthful when it stated

that Dobbs did not meet the goals in her performance improvement plan. When a defendant articulates more than one reason for termination, the plaintiff must "create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual." *Chapman*, 229 F.3d at 1024. Thus, the Defendant's Motion for Summary Judgment is due to be GRANTED on Plaintiff's ADEA claim.

### B. FMLA Claims

The Family and Medical Leave Act ("FMLA") entitles eligible employees to leave from work for certain reasons, including when the employee is suffering from a "serious health condition" that prevents her from performing her job. *See* 29 U.S.C. § 2612(a)(1)(D). If an employee takes leave for a protected reason, she has the right to return to work and be "restored . . . to the position of employment held" before the leave was taken. 29 U.S.C. § 2614(a). "To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the (FMLA) . . . and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the [FMLA]." *Strickland v. Water Works and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir.

2001). An interference claim only requires the employee to demonstrate that she was entitled to a benefit that was subsequently denied. *Id.* at 1207. A retaliation claim, on the other hand, requires the employee to demonstrate that her employer intentionally discriminated against her in the form of an adverse employment action for exercising an FMLA right. *Id.* "In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions 'were motived by an impermissible retaliatory or discriminatory animus.'" *Id.* at 1207. (quoting *King v. Preferred Technical Group*, 166 F.3d 887, 89 (7th Cir. 1999)).

### 1. Retaliation Claim

As with the ADEA, the Eleventh Circuit applies the *McDonnell Douglas* burden shifting framework for FMLA retaliation claims. *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000). The plaintiff must establish a prima facie case of discrimination by showing that: "(1) [s]he engaged in statutorily protected activity;[6] (2) [s]he experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action." *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). If the plaintiff's burden is met, the defendant must then proffer a legitimate reason for the action, at which point the plaintiff must show those reasons are

---

[6] The Hospital does not dispute that Dobbs took FMLA leave on two different occasions.

pretextual. *Id.*

Generally, demotions and reductions in pay are adverse employment actions. *See Graham v. State Farm Mutual Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999) ("[A]ctions such as . . . demotions . . . are actionable under the retaliation clause."). However, a voluntary employment action, in many cases, does not constitute an adverse employment action sufficient to support a prima facie case of discrimination. *See Graham*, 193 F.3d at 1284 (holding that a voluntary resignation was not an adverse employment action); *Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 876 (7th Cir. 1999) (finding no adverse employment action where plaintiff "sought the downgrade").

A plaintiff can meet the causation requirement by establishing that the FMLA leave and the adverse action were not "wholly unrelated." *Goldsmith v. Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). "[A] plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was a close temporal proximity between this awareness and the adverse . . . action." *Shotz v. Plantation*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003). While a one month gap in time may suffice to prove causation, *see Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986), a three to four month gap in time is generally too remote to meet the causation requirement. *See*

*Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

### a. Reduction in Title and Pay

Dobbs argues that the Hospital retaliated against her by reducing her title and pay in January of 2013. Since she took FMLA leave in August, November, and December of 2012, she has arguably presented evidence sufficient to make out a prima facie case of FMLA retaliation. The Court questions whether the reduction in title and pay was adverse. Dobbs did not actively seek her reduction in title and pay, but she did indicate agreement. She stated in her deposition that she "felt overloaded" and that she "didn't feel like [she] could do as good a job in any certain one of those five things because each one of those was a very in-depth job and very time consuming." (Dobbs Dep. 142: 7–14). When asked if she was "okay with the redistribution of duties that was discussed at the meeting," she said "yes." (Dobbs Dep. 154: 19–22). Further, she responded "No" when asked, "They didn't force you to resign as the Quality and Risk Management Director?" (Dobbs Dep. 154: 23 to 155: 1–2). However, despite this apparent agreement to the reduction in title and pay, the Court will assume for further discussion that the action was adverse.

Dobbs returned from FMLA leave in early December 2012 and then met with Nichols on January 17, 2013 where her title and pay were reduced—a period

slightly greater than a month. Because of this close proximity in time to her leave and because Nichols knew about her FMLA leave, Dobbs sufficiently demonstrates causation. Having assumed, for discussion purposes only, an adverse employment action, Dobbs has met the initial burden of proving a prima facie case of discrimination.

Even if Dobbs's reduction in title and pay was adverse, Dobbs failed to show that the Hospital's reason for demoting her was pretextual. The Hospital's proffered reason for the action was that Dobbs was overwhelmed with her many responsibilities, and Dobbs own deposition testimony supports that reason. In the statements quoted above, Dobbs noted that she was overwhelmed and that she felt she could not do all of her jobs well. Dobbs has not presented any evidence showing that she was not overwhelmed or the reason given by the Hospital was not truthful. Thus, Dobbs retaliation claim regarding her reduction in title and pay fails.

### b. Termination

Dobbs additionally argues that her termination was in retaliation for her FMLA leave. However, she has failed to prove that her termination is causally related to her leave. Here, although both Nichols and Mitchell knew about Dobbs FMLA leave, the length of time between the leave and her termination was too great. Dobbs returned from her second leave in early December of 2012, and she

was terminated in May of 2013—a period of approximately five months. A five month gap in time is far too remote to imply causation. *See Higdon*, 393 F.3d at 1220 (finding a three month gap in time too remote).

Furthermore, as with her ADEA claim, Dobbs failed to show that all of the Hospital's proffered reasons for termination were pretextual. She failed to show that Nichols and Mitchell were not truthful when relying on Dobbs's failure to adequately complete her performance improvement plan, as discussed above in Part III(A)(2). Thus, even if Dobbs could establish a prima facie case of FMLA retaliation, her claim fails. Accordingly, the Court finds that Defendant's motion for Summary Judgment is due to be GRANTED on Plaintiff's FMLA retaliation claim.

### 2. Interference Claim[7]

To prove an interference claim, a plaintiff "need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland*, 239 F.3d at 1207. An employee does not have to prove "that his employer intended to deny the benefit . . . ." *Hurlbert*, 439 F.3d at 1293. Requiring an employee to work while on leave might constitute interference with leave in

---

[7] The Hospital argues that Dobbs first asserted her Interference claim in the Status Report (Doc. 15) submitted to the Court and that the Court should not permit a new cause of action at this stage of the litigation. This assertion is not correct, as Dobbs did raise Interference in her complaint. (Doc. 1 at 2–3, ¶ 7 and 9, ¶ 37).

some instances. *See Arban v. West Pub. Corp.*, 345 F.3d 390, 402 (6th Cir. 2003) (upholding jury finding of interference where employer asked employee to perform work while on leave). However, de minimis contacts—such as asking where documents are located—do not constitute interference. *See, e.g.*, *Sabourin v. University of Utah*, 676 F.3d 950, 961 (10th Cir. 2012) (finding that requests for items taken home by an employee on leave did not constitute interference); *Daugherty v. Wabash Center, Inc.*, 577 F.3d 747, 751 (7th Cir. 2009) (finding that requests for keys and passwords did not constitute interference).

Dobbs argues that the Hospital interfered with her FMLA leave because she felt obligated to work. However, she testified in her deposition that she "actively volunteered" to work. Dobbs provided no evidence showing that anyone at the Hospital asked her to work, other than being asked where certain documents were located. The request for the location of documents was de minimis and essential to the operation of the Hospital, and any work done appears, from the undisputed evidence, to be voluntary. Thus, Dobbs failed to provide evidence showing the Hospital interfered with her FMLA leave by requiring her to work. Accordingly, the Court finds that Defendant's motion for Summary Judgment is due to be GRANTED on Plaintiff's FMLA interference claim.

## IV.    Conclusion

For the foregoing reasons, Lakeland Community Hospital, LLC's motion for summary judgment is due to be GRANTED in whole. Sandra Dobbs failed to provide evidence sufficient to show discrimination under the ADEA, retaliation under the FMLA, and interference under the FMLA.

A separate order will be entered.

Done this 21st day of September 2015.


L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
182185